IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,

                Plaintiff,                No. 03:14-cr-00476-HZ

     v.

GEONTAE BRACHAURD JONES,          OPINION & ORDER

                Defendant.

S. Amanda Marshall
UNITED STATES ATTORNEY
District of Oregon
Leah K. Bolstad
ASSISTANT UNITED STATES ATTORNEY
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204-2902

       Attorney for Plaintiff

Christopher J. Schatz
ASSISTANT FEDERAL PUBLIC DEFENDER
101 S.W. Main Street, Suite 1700
Portland, Oregon 97204

       Attorney for Defendant

1 - OPINION & ORDER

HERNANDEZ, District Judge:

Defendant Geontae Jones moves to suppress all items of physical evidence seized on October 18, 2014 and any statements he made to law enforcement following his detention and arrest. This Court conducted an evidentiary hearing on April 1, 2015, and allowed post-hearing briefing which was completed on April 16, 2015. For the reasons explained herein, I grant the motion. As a result, I deny Defendant's remaining motions as moot.

BACKGROUND

On October 4, 2014, Portland Police Officer Charles Asheim, a member of the Portland Police Bureau's Gang Enforcement Team (GET), responded to a reported shooting in the vicinity of Thatcher's Bar, located at 7906 SE Stark Street in Portland. Employees of Thatcher's reported that there had been a disturbance inside the bar among people described as gang members. The disturbance spilled outside and the shots were fired shortly after that. Witnesses reported that shots were fired from a car. Casings were found across the street and northwest of Thatcher's, on Southeast 79th Avenue, north of Stark Street. In investigating the incident, Officer Asheim contacted multiple known gang associates and members in the area. He identified some of the gangs involved as Hoover Criminal, Kerby Bloc, and Rolling 60 Crips.

Approximately two weeks later, on October 18, 2014, Shawn Czech, an employee of Thatcher's, called the police non-emergency line at approximately 1:56 a.m. reporting possible gang presence at Thatcher's. Gov't Ex. 2; Def. Exs. 215 at 1, 234 at 1-2. This initial report was of ten "gangster types," a few of whom were inside and a few of whom were outside. Id. There were no problems at the moment, but Czech requested a police "walk through" due to recent gang activity in the location. Id. At 2:01 a.m., Portland Police Officer Brian Lloyd was

2 - OPINION & ORDER

dispatched in response to the call.  Gov't Ex. 2; Def. Ex. 215 at 1.

A few minutes later Czech called 911 to report that there was now a fight outside in front of the bar.  Gov't Ex. 2; Def. Exs. 215 at 2, 234 at 3.  She stated that there were fifteen to twenty people involved and that there was fist fighting but no weapons.  Id.

When the 911 operator updated Officer Lloyd that there was now a fight in front of Thatcher's, Officer Brian Dale, a GET officer, reported over the radio that he just gotten off the phone with someone at Thatcher's who requested that a couple of cars be sent over because the caller believed there was going to be fight.  Def. Exs. 215 at 2, 234 at 5-6.  Dispatch stated that three cars were en route and the report now was of ten gang members fighting out front.  Def. Exs. 215 at 2, 234 at 6.  Officer Dale immediately clarified that the caller had said "they weren't actively fighting now but they went outside and [the caller] thought something was going to happen."  Id.

Officer Lloyd testified that upon being dispatched, he drove towards Thatcher's.  He first conducted an "area search" of the surrounding streets, driving in a circle around Thatcher's.  The report showing his arrival on scene at 2:06:27 a.m., Gov't Ex. 2, reflects the time he arrived in the area, not specifically at Thatcher's.  He could not recall if he saw people in the area but he testified that he saw no fighting in the surrounding streets.  He then pulled up in front of Thatcher's and, while remaining in his patrol car, spoke to one individual for ten to twenty seconds.  That person told Officer Lloyd that two SUVs had just left a "little bit ago" and that they were the ones involved in the fight.  He testified that he was told the vehicles were a white Land Rover and a dark-colored large SUV.  The person he spoke with implied, by pointing, that the SUVs had traveled eastbound on SE Washington Street.

3 - OPINION & ORDER

It was clear that the fight was over and, as Officer Lloyd testified, everything at the bar was "good to go." While at Thatcher's, Officer Lloyd observed nothing troubling; everything was pretty calm at that time.

Officer Lloyd reported to dispatch that the fight was over, everyone had separated, and there were two subjects in a dark colored SUV. Def. Exs. 215 at 3, 234 at 6. He stated that everybody else, referring to other police officers, could clear. Id. Dispatch repeated the information that the fight was over and everyone could clear. Although Officer Lloyd testified that he relayed information of two SUVs heading eastbound on Washington Street, the dispatch recording and transcript show that he reported that there was only one SUV. Def. Exs. 215 at 3; 234 at 6-7. He also did not report the direction it was traveling. Id.

Officer Dewey Madison acknowledged the "clear" dispatch and reported that he was now back in service, meaning available to respond to another call. At that point, Officer Dale inquired if the "clear" was in regard to "our" call on Stark, to which dispatch responded yes and reported that Officer Lloyd was on scene and that the fight was over. Def. Exs. 215 at 3; 234 at 7. Officer Dale stated that he was going to continue to do an "area check." Id.

Dispatch reported that two subjects were last seen in a dark colored SUV. Def. Exs. 215 at 3-4, 234 at 7. Officer Madison then asked Officer Lloyd whether he got a "make" on the SUV. Def. Exs. 215 at 4, 234 at 7. Officer Lloyd responded that he did not, just that it was a dark color, two subjects, unknown race, male. Id.

Officer Madison then reported that there were two SUVs eastbound on SE Washington from SE 82nd "right now." Id. Officer Lloyd responded by stating "I think they said it was two SUVs." Id. Dispatch then asked Officer Madison if he wanted to go back on the call to which he

4 - OPINION & ORDER

said yes. Id. He reported that he was following them "right now" at SE 88th and SE Washington. Id. At that point, Officer Lloyd stated on the radio that "there was really no crime at the bar. Just, they were out front fighting." Id.

Officer Madison testified that he was heading north on SE 82nd Avenue when he saw two SUVs stopped at a traffic light eastbound on SE Washington. As he drove northbound, he looked at the two SUVs and observed that the occupants of both vehicles were talking to each other. The vehicles were close together, the windows were down, and the occupants were leaning towards each other talking. Officer Madison was unable to identify the race or gender of the occupants. Officer Madison proceeded north through the intersection then turned west, or left, into a Chevron gas station on the northwest corner of the intersection of SE 82nd Avenue and SE Washington. He pulled into the gas station's parking lot and then pulled behind the two SUVs which he stated were still stopped at the light and heading east on SE Washington.

In response to Officer Madison's report that the SUVs were traveling east on SE Washington, Officer Dale stated that he was waiting for them at Interstate 205 and SE Washington. Def. Exs. 215 at 4-5, 234 at 8. Officer Madison reported that the two SUVs were a silver Range Rover and a silver Tahoe or Suburban. Def. Exs. 215 at 5, 234 at 8. At this point Officer Christopher Gjovik[1] reported that those were "the same two vehicles causing the problem that was at Shimmer's last night." Id. Officer Madison testified that he understood the reference

---

[1] Some exhibits indicate that Officer Matthew Ginnow made this comment. Officer Ginnow testified, however, that those exhibits were in error and the person making this statement was Officer Gjovik. Officer Ginnow also explained that the information reported about the previous night's incident at Shimmer's was intended for "officer safety."

5 - OPINION & ORDER

to Shimmer's to be to some type of gang related fight or something the night before.[2]  Officer

Madison was not on that call and has no first hand knowledge of the events at Shimmer's.

Next, another unidentified officer radioed that the previous night a man named Leonard

Ray Brightmon was driving the Range Rover.  Id.  Officer Madison testified that Brightmon is a

known Hoover gang member and the broadcast of this information was for officer safety

purposes.[3]  Officer Madison did not know at the time who was in the Range Rover.

Officer Dale stopped the Range Rover.  Id.  Officer Madison then stopped the other SUV,

a Chevy Tahoe, at approximately SE 105th and SE Washington.  Id.  The stop occurred at 2:13

a.m.  Gov't Ex. 2; Def. Ex. 234 at 8.

According to Officers Lloyd and Asheim, at the time Officer Madison stopped the Chevy

Tahoe, the traffic was very light.  No other SUVs stood out to Officer Asheim.  Officer Madison

was not a GET officer, but he had received a four-hour "block instruction" from the GET on

gangs, gang crimes, and how to investigate gangs.  He testified that gang members will

sometimes transport injured persons to the hospital themselves, a practice he referred to as "self-

transport."  Thus, when asked why he stopped the Chevy Tahoe, he testified that it was to make

sure that everybody was okay and that nobody in the vehicle was injured from the fight.

Right after Office Madison stopped the Chevy Tahoe, Officer Lloyd arrived on scene,

followed by Officer Asheim and his partner Officer Andy Polas.  Officer Madison testified

---

[2]  Officer Madison's testimony was unclear whether he possessed this understanding of
the Shimmer's reference on October 18, 2014 or if he acquired this information later.

[3]  As with his testimony about Shimmer's, Officer Madison's testimony was unclear if he
knew of Brightmon's gang association on October 18, 2014 or if he acquired this information
later.

Officer Asheim arrived almost immediately, a few minutes at the most, after the stop and recognized the only male occupant, Defendant.  Although Officer Madison did not know any of the four women and one man in the Chevy Tahoe, Officer Asheim identified Defendant to Officer Madison.  Because Officer Asheim was a GET officer, he assumed primary responsibility over the stop from then on, with Officer Lloyd and Officer Madison supporting him.

Officer Asheim engaged Defendant in conversation through the open window of the Chevy Tahoe.  They discussed the fight at Thatcher's as well as whether Defendant had been with Brightmon.  According to Officer Asheim, Defendant told him that the fight involved two women and that he decided to get a ride from some girls to avoid being in trouble.  Officer Asheim did not believe what Defendant told him about the fight.  Meanwhile, Officer Polas was talking to the driver of the Chevy Tahoe about consent to search the vehicle.  Officer Asheim stated that Defendant seemed to be paying attention to that conversation.  He asked Defendant for his consent to search the SUV.  Defendant gave his consent, but also told Officer Asheim that he should check with the driver.  Officer Asheim testified that when he and Defendant observed Officer Polas getting the driver out of the car and her giving Officer Polas consent to search the SUV, Defendant's whole physical demeanor changed.  He went from talkative to quiet, sunk down in the seat and slumped forward, and his chest began rising and falling rapidly, as if he were taking deep breaths.  When asked by Officer Asheim about weapons, Defendant denied having anything on him and said he did not know about anything in the SUV.  Officer Asheim asked Defendant why he appeared so nervous.  Defendant told him he was not nervous, just drunk.  Officer Asheim became concerned for his own safety.

Officers then escorted the SUV's occupants out of the vehicle.  Officer Asheim assisted

Defendant whom he described as limp and slack which Officer Asheim found odd.  At that point,

Officer Asheim decided to arrest Defendant for what he believed were probation or parole

violations for the use of alcohol, presence at a bar, and associating with other gang members.  He

later learned that Defendant did not have such conditions imposed on him.

The officers, having obtained consent, searched the Chevy Tahoe.  During the search,

Officer Polas found a black, 9 mm Glock model 34 handgun as well as a high capacity 31 round

magazine.  The gun was found behind the rear passenger seat where Defendant had been sitting,

underneath a t-shirt.  Knowing that Defendant was a convicted felon, Officer Asheim requested

that DNA evidence be obtained from the gun.  He also gave Defendant his Miranda rights.

Defendant was eventually placed in a patrol car and charged with various crimes.  On December

2, 2014, a federal grand jury indicted Defendant on one charge of being a felon in possession of a

firearm in violation of 18 U.S.C. § 922(g)(1).

## DISCUSSION

Defendant argues that items of physical evidence seized on October 18, 2014, as well as

any statements he made to law enforcement officers after his detention and arrest on that date,

must be suppressed because law enforcement (1) violated his Fourth Amendment rights by

performing a traffic stop on the Chevy Tahoe without reasonable suspicion; (2) violated his

Fourth Amendment rights by arresting him without probable cause; and (3) violated his Fifth

Amendment rights by conducting a custodial interrogation without first obtaining from him a

knowing and effective waiver of his Miranda rights.  Because I agree with Defendant that the

officers lacked reasonable suspicion to stop the SUV, I do not discuss the other bases for the

motion.

The Fourth Amendment permits investigatory, or "Terry" stops when law enforcement officers have a "reasonable suspicion" that criminal activity "may be afoot." United States v. Valdes-Vega, 738 F.3d 1074, 1078 (9th Cir. 2013) (en banc) (internal quotation marks omitted), cert. denied, 134 S. Ct. 2743 (2014); see also Terry v. Ohio, 392 U.S. 1, 30 (1968) (Fourth Amendment applies to investigatory stop short of full arrest). "[R]easonable suspicion exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for particularized suspicion." United States v. Montero-Camargo, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc). "[P]articularized suspicion encompasses two elements." Id. "First, the assessment must be based upon the totality of the circumstances. Second, that assessment must arouse a reasonable suspicion that the particular person being stopped has committed or is about to commit a crime." Id. (footnote and citation omitted).

Reasonable suspicion may not be based on "broad profiles," "overbroad generalizations," or "a prefabricated or recycled profile of suspicious behavior[.]" United States v. Sigmond-Ballesteros, 285 F.3d 1117, 1121, 1124, 1126 (9th Cir. 2002) (internal quotation marks omitted). However, a stop may be founded on reasonable suspicion despite a possible innocent explanation for every police observation. United States v. Tiong, 224 F.3d 1136, 1140 (9th Cir. 2000). Moreover, given that the standard for reasonable suspicion is "a particularized and objective basis for suspecting the person stopped of criminal activity[,]" the "quantum of proof needed for reasonable suspicion is less than a preponderance of evidence, and less than probable cause." Id. (internal quotation marks omitted). As the Ninth Circuit recently noted, the "reasonable-suspicion standard is not a particularly high threshold to reach" although more than a "mere

9 - OPINION & ORDER

hunch" is required.  Valdes-Vega, 738 F.3d at 1078 (internal quotation marks omitted).

Important to this case is the requirement that the circumstances assessed are those known or properly imputed to the detaining officer(s) at the time of the stop.  Courts making reasonable suspicion determinations "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing."  United States v. Arvizu, 534 U.S. 266, 273 (2002) (emphasis added); see also United States v. Cortez, 449 U.S. 411, 417-18 (1981) (based on the "whole picture[,] the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity").

While detaining officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person," Arvizu, 534 U.S. at 273 (internal quotation marks omitted), their ability to rely on information known only by other officers is limited.  The collective knowledge doctrine "allows courts to impute police officers' collective knowledge to the officer conducting a stop, search, or arrest."  United States v. Villasenor, 608 F.3d 467, 475 (9th Cir. 2010).  The Ninth Circuit recognizes only two situations in which the collective knowledge doctrine may be used.  First, it applies "where law enforcement agents are working together in an investigation but have not explicitly communicated the facts each has independently learned."  United States v. Ramirez, 473 F.3d 1026, 1032 (9th Cir. 2007).  Even when certain information giving rise to reasonable suspicion or probable cause is not actually given to the detaining officer, some communication among officers is required.  Id. at 1032-33 ("cases suggest a limited requirement that there be a communication but not necessarily the

conveyance of any actual information among officers"). This communication requirement serves to "distinguish officers functioning as a team from officers acting as independent actors who merely happen to be investigating the same subject." Id. at 1033 (internal quotation marks and brackets omitted).

Second, the doctrine applies "where an officer . . . with direct personal knowledge of all the facts necessary to give rise to reasonable suspicion . . . directs or requests that another officer . . . conduct a stop, search or arrest." Id. at 1033. "In both situations, collective knowledge may be imputed only if there has been some communication among agents." Villasenor, 608 F.3d at 475 (internal quotation marks omitted).

Based on the testimony and documents received at the evidentiary hearing, detaining Officer Madison knew the following at the time he stopped the Chevy Tahoe:

(1) there may or may not have been a fight at Thatcher's (report from caller to 911 that there was a fist fight in front of the bar involving fifteen to twenty people; report from Officer Dale that people went outside but there was no active fighting at the moment);

(2) even if there was a fight, it was resolved before Officer Lloyd arrived at Thatcher's where everything was calm;

(3) two subjects had left Thatcher's in a dark colored SUV;

(4) police officers were told they could "clear";

(5) In response to a question from Officer Madison, Officer Lloyd confirmed he did not get a "make" on the SUV, but stated it was a dark color and there were two subjects, unknown race, male;

(6) Officer Madison observed two SUVs eastbound on SE Washington and SE 82nd,

11 - OPINION & ORDER

within several blocks of Thatcher's;

(7) Officer Lloyd reported that he thought they said it was two SUVs[4];

(8) Officer Lloyd reported that there had been no crime at Thatcher's;

(9) Officer Madison observed occupants of two SUVs at SE 82nd and SE Washington talking to each other[5];

(10) Officer Madison observed that the two SUVs were a silver Range Rover and a silver Tahoe or Suburban;

(11) Officer Gjovik reported that those two vehicles had been causing a problem at Shimmer's last night, a reference understood by Officer Madison to be to some sort of gang fight or "something" the previous night;

(12) An unidentified officer reported that the previous night, Brightmon had been driving "the Range Rover."  Because Brightmon was a known gang member, Officer Madison understood this broadcast to be for purposes of officer safety.

Based on these facts, Officer Madison stopped the Chevy Tahoe because he wanted to "make sure that everyone was okay, you know, make sure there was nobody injured in the vehicle from the fight or just -- you know, just the basic, just calling from the fight."

While the Government does not mention the collective knowledge doctrine in its briefing,

---

[4]  Defendant challenges the credibility of Officer's Lloyd's testimony that he received information that there were two SUVs instead of the initial single SUV he first reported.  I do not resolve the credibility issue because even accepting that Officer Lloyd was told that there were two SUVs, I still conclude that Officer Madison lacked reasonable suspicion for the stop.

[5]  Defendant challenges the credibility of Officer Madison's testimony that he observed the occupants of the two SUVs talking to each other.  I do not resolve the credibility issue because even accepting Officer Madison's testimony, I still conclude that Officer Madison lacked reasonable suspicion for the stop.

it relies heavily on testimony from Officer Asheim to support its argument that Officer Madison had reasonable suspicion to stop the Chevy Tahoe.  The Government cites to Officer Asheim's testimony regarding the behavior of gangs, the possession of firearms by gang members, the pattern by gang members of returning to the scene of a prior incident, the ongoing disputes between rival gangs including members of the Hoover gang, the details of the previous night's incident at Shimmer's[6], and his knowledge that Brightmon was a well-known Hoover gang member with a history of violence whom Asheim had observed with a large group of Hoover gang associates just one week before October 18, 2014.

Officer Asheim's knowledge cannot be imputed to Officer Madison and his testimony is not properly considered in analyzing the existence of reasonable suspicion for the stop.  There was no evidence that Officer Asheim directed Officer Madison to make the stop.  There was also no evidence that Officer Asheim and Officer Madison were part of an investigating team or that they shared any kind of relationship other than both being members of the Portland Police Bureau.  Officer Madison is not a GET officer and was not participating in any type of investigation of gang activity generally, the Hoovers in particular, or Defendant specifically. Rather, Officers Asheim and Madison were "independent actors" who, solely because of timing and location, "were involved in investigating the same subject."  The collective knowledge

---

[6]  According to the testimony of Officer Ginnow, the Shimmer's incident started with a report of about a dozen black males, possibly gang members, going in and out of the bar and possibly dealing drugs in the parking lot.  See Gov't Ex. 1.  Officer Ginnow was one of the officers who responded to the request for a walk through.  He stated there was no fighting at the scene.  He was positioned in the parking lot and observed no drug dealing there.  He did see a tan Chevy Tahoe parked there, but there was nothing occurring around it.  There were several vehicles in the parking lot.  There was nothing suspicious about the Chevy Tahoe being at Shimmer's.

doctrine does not apply here.

At the time he first spotted the two SUVs approximately four blocks from Thatcher's and headed away from the bar, Officer Madison had been told there was only one SUV and that it was dark colored.  Neither of the SUVs he observed was dark colored.  Upon inquiry, he learned that Officer Lloyd "thought they said" it was two SUVs.  Officer Madison observed the occupants talking to each other.  Dispatch had reported two subjects and despite observing the occupants of the SUVs, Officer Madison did not provide information either in his report or his testimony as to how many occupants he observed or their race or gender.  He learned that the two SUVs were at Shimmer's the previous night in an incident he vaguely described, erroneously as it turns out, as a gang-related fight or something.  He learned that the previous night, Brightmon had been driving a car that matched the description of one of the SUVs.[7]

Officer Madison did not know about the October 4, 2014 shooting incident near Thatcher's or that there may have been rival gang activity involving the Thatcher's location.  He had no specific information about what occurred at Shimmer's the previous night including no information about whether a crime had been committed or whether the current occupants of the Chevy Tahoe had been at Shimmer's.  Although Officer Dale stopped the Range Rover before Officer Madison stopped the Chevy Tahoe, Officer Madison did not know whether Brightmon was an occupant in the Range Rover when he stopped the Chevy Tahoe.

---

[7]  Even if Officer Madison knew about Brightmon's gang affiliation on October 18, 2014, he and Officer Ginnow both testified that this information was intended to be an "officer safety" warning so that if they were to make a traffic stop, they would proceed cautiously.  The officers did not suggest that the information was part of the totality of circumstances providing reasonable suspicion for the stop.  And, even if it were, it concerned the silver Range Rover, not the Chevy Tahoe or the occupants within the Chevy Tahoe.  Moreover, Officer Madison stopped the Chevy Tahoe before Brightmon's presence in the Range Rover was confirmed.

The issue is whether there were "specific, articulable facts which, when considered with objective and reasonable inferences, formed a basis for particularized suspicion" that persons in the Chevy Tahoe had committed or were about to commit a crime. Montero-Camargo, 208 F.3d at 1129 (emphasis added). It is not enough to suspect that the occupants of the Chevy Tahoe may be gang members or persons who associate with gang members. Gang member status in and of itself is not criminal activity. Here, other than observing two SUVs near Thatcher's shortly after the report of a possible fight and the occupants of those vehicles talking to each other, Officer Madison possessed no facts giving rise to a reasonable suspicion that any person in the Chevy Tahoe had committed a crime. The last report from Officer Lloyd was that *there was no crime at Thatcher's*. With that report, the conclusion that the occupants of the Chevy Tahoe were or had been engaged in criminal activity was not reasonable. Additionally, there was no report of any injury, any use of any weapon, or any other facts suggesting someone was hurt. The facts show that the situation had resolved quickly such that everything was calm by the time Officer Lloyd arrived.

While there may have been few cars on the road at the time, SUVs are not a particularly distinctive vehicle. The report was that the SUV was dark. Neither of these SUVs matched that description. The initial report was of one SUV and it was not until Officer Madison inquired that Officer Lloyd "thought" the individual he spoke with at Thatcher's said it was two. Although Officer Madison's observation that the occupants of the two SUVs were talking to each other could suggest that the SUVs were traveling together, that is not enough to arouse reasonable suspicion of criminal activity when considered with all of the other facts. That fact is not inconsistent with other law-abiding conduct and it "describe[s] too may individuals to create a

15 - OPINION & ORDER

reasonable suspicion that this particular defendant is engaged in criminal activity." <u>United States</u>
<u>v. Hernandez-Alvarado</u>, 891 F.2d 1414, 1418-19 (9th Cir. 1989); <u>see</u> <u>also</u> <u>United States v.</u>
<u>Manzo-Jurado</u>, 457 F.3d 928, 935 (9th Cir. 2006) ("[s]eemingly innocuous behavior does not
justify an investigatory stop unless it is combined with other circumstances that tend
cumulatively to indicate criminal activity.").

      The facts provided Officer Madison with nothing more than a guess or hunch that
someone in the Chevy Tahoe might be a gang member or associate who might have been at the
scene of a fight described by a fellow officer as not a crime.  Considering the totality of the
circumstances, the facts did not give Officer Madison particularized suspicion that an occupant
of the Chevy Tahoe had committed a crime.  Although not determinative, Officer Madison's
testimony that he stopped the Chevy Tahoe to make sure everyone was okay[8] suggests there was
no objective basis to believe any occupants of the Chevy Tahoe had been involved in criminal
activity.  Accordingly, the stop was unlawful under the Fourth Amendment.

/ / /

/ / /

/ / /

/ / /

/ / /

---

      [8]  The Government does not rely on the emergency aid doctrine which provides an
exception to the Fourth Amendment's warrant (or reasonable suspicion) requirement when
officers have "an objectively reasonable basis" to conclude that an emergency is occurring and
immediate action is necessary to protect themselves or others from serious, imminent harm.
<u>Brigham City v. Stuart</u>, 547 U.S. 398, 400 (2006).  While Officer Madison expressed concern
about whether the occupants in the SUV were all okay, there is no objectively reasonable basis to
conclude on these facts that there was an emergency.

CONCLUSION

Defendant's motion to suppress [18, 33] is granted.  Defendant's remaining motions, to

the extent they remain contested, for release of <u>Brady</u> material [19], to exclude evidence [20], to

exclude prior convictions [21], to require the Government to provide Rule 404(b) notice [22],

and to produce expert witness statements no later than thirty days before trial [23], are denied as

moot.

IT IS SO ORDERED.

Dated this _____ day of _____, 2015


_____
Marco A. Hernandez
United States District Judge

17 - OPINION & ORDER